# IN THE OREGON TAX COURT

## UNITED TELEPHONE COMPANY OF
## THE NORTHWEST, INC.

*v.*

## DEPARTMENT OF REVENUE

(TC 2037 and 2209)

John B. DesCamp and James R. Draudt, Weiss, DesCamp, Botteri & Huber, Portland, represented plaintiff.

G. F. Bartz and James C. Wallace, Assistant Attorneys General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered December 5, 1986.

**CARL N. BYERS, Judge.**

Plaintiff is a public telephone business headquartered in Hood River, Oregon, doing business in both Wash-

ington and Oregon. Plaintiff appeals from the Department of Revenue's determination of true cash value of plaintiff's Oregon property for the tax years 1983 and 1984. Due to the interstate and integrated nature of plaintiff's business, the established procedure is to first ascertain the value of all taxable property utilized in the business (the unit) and then allocate a portion of that value to the taxable property located in Oregon. See ORS 308.550 and ORS 308.555. The allocation is based upon a formula[1] established by the Western States Association of Tax Administrators. The allocation method and its application are not disputed in this case.

Although the three traditional approaches to value are utilized, certain adaptations are made to accommodate the nature of the property in question. Since plaintiff is a regulated public utility, in the cost approach "historical cost less depreciation" (HCLD) is utilized rather than reproduction or replacement cost new less depreciation. This is in recognition that the government sets rates for public utilities based on HCLD. Similarly, because whole telephone companies rarely, if ever, are sold, the stock and debt approach is used as a surrogate for the market comparison approach. The stock and debt approach is based upon the accounting axiom that the sum of debt and equity of a corporation represents its net worth. Finally, in the income approach, there are several formulas that may be used, based upon financial analysis of the operating entity, to ascertain the present value of the integrated assets.

In order to avoid undue length in this opinion, discussion of the application of the approaches will be limited to the essentials.[2]

The credentials and experience of the expert witnesses in this case are impressive. Dr. John H. Davis III testified on behalf of plaintiff. Dr. Davis has a doctoral degree in

---

[1] The formula basically allocates the value in the following proportions or weights: 75 percent based on cost new; 15 percent based on operating revenue; and 10 percent to net income.

[2] Although both 1983 and 1984 are before the court, the court's discussion of the financial data in this opinion is based on the 1983 year. It is not deemed necessary to discuss the theory or evidence where the appraisers are in agreement or the point is not necessary to the decision. A more detailed explanation of the approaches and their use is found in *Burlington Northern et al v. Dept. of Rev.,* 8 OTR 19 (1979).

finance, is a member of the American Institute of Real Estate Appraisers, holds the designation of Senior Real Property Appraiser (SRPA) from the Society of Real Estate Appraisers and is a Senior Member of the American Society of Appraisers. Dr. Davis has taught both finance and valuation courses as well as having had extensive valuation assignments and experience.

In the opposing corner was the department's in-house expert witness, Mr. Roger Maude. Although Mr. Maude has less formal education, having obtained a civil engineering degree prior to his employment with the defendant, he benefits from approximately 25 years of full-time experience appraising property similar to the plaintiff's. During this period he has made in excess of 3,000 market value appraisals. In addition to Mr. Maude, defendant brought in reinforcements. Dr. James Ifflander, whose education and background experience is similar to Dr. Davis', testified with regard to the two appraisals of the main expert witnesses. Also, defendant called Mr. Edmund D. Morrison III, a Supervisor of the Utility Telecommunications Section in the Oregon Public Utility Commission and Mr. Philip Nyegaard, also an employee of the Public Utility Commission and expert in the analysis of the cost of capital. Although the testimony of both PUC experts related to valuation and financial analysis in the context of regulation of plaintiff, that information and perspective added considerably to the court's understanding. Other witnesses provided additional information which was helpful.

The differences between the parties arise primarily from the application of the the three approaches to value. Consistent with the appraisers' approaches, the court will consider the approaches individually and then correlate its findings.

*Stock and Debt Approach.* Dr. Davis used the stock and debt approach. The use of the approach is disputed because plaintiff is a wholly owned subsidiary of United Telecommunications, Inc., a large nonregulated and diversified company. As a wholly owned subsidiary, plaintiff's stock is not publicly traded. In order to use the stock and debt method, some portion of the total stock and debt of the parent must be allocated to the wholly owned subsidiary. To do this, Dr. Davis used the "asset influence" method. This method requires

making an allocation in the proportion that the net telephone plant of the plaintiff as a subsidiary represents to the total telephone plant of the parent. While this method appears reasonable, in this case its reliability is questioned. Plaintiff represents only 3.3 percent of the parent. Mr. Maude declined to use the method, concluding that such a small percentage, combined with the fact that the parent is not a regulated company like the plaintiff, makes the possibility of error too great and the result unreliable. Plaintiff's response is that the parent is composed primarily of telephone companies like plaintiff and that the securities market views the companies as comparable in nature.

■      The court finds that the nature of the parent and plaintiff are sufficiently alike to permit use of the method. Defendant's own witness, Dr. Ifflander, in discussing potential growth in connection with Exhibit V, indicated that the parent company is considered fairly comparable to plaintiff. The court agrees with Dr. Davis that the question of reliability of the indicator of value due to the small percentage of the plaintiff can be adjusted for by assigning a lesser weight to the indicator of value. This approach is worth working with because it reflects all forms of obsolescence and is based on direct market data. In addition, although plaintiff is a small percent of the parent, the value indicator is directly derived, as opposed to the income approach which derives an indicator by capitalization.

   *Cost Approach.* As indicated above, plaintiff's telephone rates are regulated by Public Utility Commissions (PUCs). A basic premise of the PUC is to allow the company to earn a rate of return on its invested capital. Hence, the PUCs look to historical cost rather than current costs. As a regulated utility, plaintiff's historical costs are reported and audited. As a result, both appraisers agree that the HCLD for 1983 was $139,704,400. The only disagreement between the two appraisers is that Dr. Davis has deducted an amount for obsolescence. Dr. Davis explained that where actual earnings of the company are less than the expected market rate of return, the difference between the two, when capitalized, will reflect obsolescence in the property.[3]

---

[3] As shown on page D-2, Exhibit 16, Dr. Davis multiplies the HCLD of $139,704,371 by his discount rate of 15.45 percent which results in required earnings of

In reaching his conclusion, Dr. Davis has made two significant errors. First, as illustrated by defendant's charts (Exhibits E-1 through E-3), the mathematical logic of Dr. Davis' approach essentially converts the cost approach to an income approach. Where the income and the rate are given, Dr. Davis' method will always result in a value exactly the same as the income approach because it shoves the cost out the back door. Algebraically, the method cancels all cost in excess of the value indicated by the income approach as obsolescence.

Dr. Davis cites as authority the method described beginning on page 487 in the text *The Appraisal of Real Estate* (8th ed) published by the American Institute. The problem as perceived by the court is not the method, but the manner in which it is used. As explained in the text, external obsolescence is measured by capitalizing that "portion of the net income loss due to the deficiency." The example given in the text on page 488, and Dr. Davis' own example of two hotels with different locations, assumes a determination of obsolescence in one property based on a comparison with a like kind of property. In other words, the test is not what this property earns in comparison with all other possible investments, but what this property earns compared with similar properties.

The method in the text does not countenance the appraiser essentially replacing cost data with income data. Appraisers use different approaches because different kinds of data are relevant to value. In theory, each approach views the concept of value from a different perspective, with the intent of considering all facts and perspectives relevant in the marketplace. Adjusting one approach to make it rely on and result in the same indication of value as another approach effectively eliminates a relevant perspective from consideration.

"Where data for use of the three approaches to value are available, the overwhelming weight of authority on the part of writers and qualified experts is that each of the three approaches to value should be utilized." *Pacific Power & Light Co. v. Dept. of Rev.*, 7 OTR 203, 217 (1977).

---

$21,584,325. Deducting the projected earnings of $15 million from the required earnings results in an income "shortfall" of $6,584,325. When this figure is capitalized at 15.45 percent, it results in an obsolescence figure of $42,616,990.

■ The second error of Dr. Davis is his assumption that failure to earn a market rate of interest on HCLD is an indication of obsolescence. The fact that other investments may produce a greater return is no indication of obsolescence. The evidence in this case established that regulated utilities are viewed as bearing less risk than other companies and therefore can obtain investor capital at less cost. Hence, it is to be expected that their earnings would be less than companies which bear a greater risk. If there is obsolescence in plaintiff's property, it can only be disclosed in this context by comparing plaintiff's income with the income of comparable telephone companies. To utilize the method as explained in the textbook on which he relies, Dr. Davis should first determine the rate earned on HCLD by comparable regulated telephone companies. If, after applying that rate to plaintiff's HCLD he finds an "income shortfall," then he can capitalize that income shortfall as a measure of economic obsolescence.

Accordingly, the court must disregard the obsolescence as calculated by Dr. Davis.[4] This leaves both appraisers utilizing the same HCLD.

*Income Approach.* "Appraisers use the income capitalization approach * * * because it measures the present value of the expected future benefits of ownership." American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 348 (8th ed 19.)

The simple formula used to express the capitalization process[5] may mislead the uninitiated to believe this approach is easy to use. Where a complex property is involved, such a belief must be quickly dispelled. In this case, the appraisers recognized that debt and equity capital demand different rates of returns in the marketplace. Hence, each appraiser first had

---

[4] Plaintiff's assets may suffer from some obsolescence. For example, assume the PUCs allowed rate of return of 12.3 percent is used as a surrogate measure for comparable regulated telephone companies. If the 12.3 percent is applied in Dr. Davis' method, it would result in an income shortfall of $2,183,641 ($139,704,400 × .123 = $17,183,641 − $15,000,000). When capitalized at 12.3 percent, this results in indicated obsolescence of $17,753,178, or a net indication of value by the cost approach of $121,951,220.

[5] The traditional and simple expression of the process is

$$\text{Value} = \frac{\text{Income}}{\text{Interest Rate}}$$

to determine an appropriate capital structure. Standing on that foundation, the appraisers next analyzed market data to ascertain an interest rate for each category of capital. Only when this framework was complete could the appraiser determine an appropriate composite or weighted average cost of capital.

■ Although the differences between the appraisers' conclusions with regard to each step are not large, they are important. Dr. Davis used plaintiff's actual capital structure of 45 percent debt and 55 percent equity. Mr. Maude utilized a capital structure of 33 percent debt and 66 percent equity. In weighing the data and the reasoning used by each appraiser, the court finds it cannot accept Mr. Maude's conclusions as to the appropriate capital structure. The three companies which Mr. Maude used as his sample do not appear to the court to be either comparable in size or capital structure. Two of the companies have contrasting rather than comparable capital structures, *i.e.,* Commonwealth has a capital structure of 39 percent equity and 61 percent debt while Rochester has a capital structure of 76 percent equity and 22 percent debt. With this range in such a small sample, any average is meaningless. Plaintiff's actual capital structure is far more relevant and meaningful.

Dr. Davis found 15.45 percent as the appropriate weighted average cost of capital. Mr. Maude found a rate of 15 percent. However, when corrected for the math errors in Mr. Maude's DCF model, his average was 15.375 percent. The court accepts Dr. Davis' rate as appropriate. The appraisers were likewise close in their estimates of the annual income to be capitalized, Dr. Davis finding an annual income of $14,679,158 (rounded to $15,000,000) and Mr. Maude finding $14,432,000.

The calculation of these factors brings us to the pivotal issue in this case which is the question of "growth."[6]

As acknowledged by both appraisers, the interest rate demanded by the market as a return on invested capital includes all market expectations with regard to growth,

---

[6] Plaintiff recognizes that "the difference of opinion between the department and Dr. Davis results from the manner in which g is treated in the cash flow projections." (Plaintiff's Reply Brief, at 24.)

whether real or inflationary. On the other hand, the appraiser must estimate or determine whether the income flowing from a property is likely to increase or diminish over time. It should be obvious that if a flat or no growth income is divided by an interest rate which expects growth, the resulting indication of value will be substantially lower than if growth in income is expected.

The important question in this case is whether plaintiff's income from the subject property is expected to grow over time.

In this case Mr. Maude projected growth in the income and adjusted for it in his perpetuity models in two different ways. In one model he adjusted the rate to eliminate any element of growth and applied it to match his estimate of income without any growth. His second model utilized a market rate of return, which included a growth element, and also projected growth in the future income. Mr. Maude explained that the expected increase in income is due to an increase in debt costs caused by inflation. Since debt represented about one-half of the income, in his opinion, he applied only one-half of the expected five percent annual inflation to the total income of the plaintiff. (Exhibit A, at 33.) The court has serious reservations about the accuracy of Mr. Maude's application, both as to the proportion of the debt and timing. It seems inconsistent to develop a capitalization rate based on a capital structure of 33 percent debt and 66 percent equity while in the same case assuming growth based on a capital structure of 50 percent debt and 50 percent equity. Also, as pointed out by plaintiff, Mr. Maude's schedule projects an increase in debt costs beginning in the first year when the facts indicate that plaintiff's debt will not start "rolling" until several years after the assessment years in question. (Exhibit 4, at 46-47.)

On the other hand, although Dr. Davis used a market rate of return, which included an element for growth, he did not project any growth in plaintiff's income. Rather, he projected a level income with "no future prospects of future growth and income, dividends or price." (Tr 66.) Dr. Davis reasons that "we're valuing just the assets in the asset pool today. We cannot consider future growth in plant because it's not legal to assess plant not in existence." (Tr 65.) In his

discussion, Dr. Davis recognized that the market expects growth as reflected in the price-earnings ratio or the reciprocal earnings-price ratio. In recognition of this, he indicated that it would be necessary to adjust the earnings-price ratio for a regulated utility. (Tr 68.)

In this regard, Dr. Davis makes a fundamental error. It is true that the tax laws tax only the existing assets. However, the ad valorem tax is levied on the present value of the assets. That value includes *all* benefits expected to be received in the future from those assets. If any growth is expected, the present value of those expectations must be reflected in the fair market value of the property. Growth must come from something. If any growth is expected, it is the taxable assets which will produce it. Hence, the value of existing assets includes their potential for growth, just as the value of a thoroughbred horse includes the potential for future offspring. While the state cannot tax that future offspring because it is not in existence, the potential of the thoroughbred horse to produce offspring is an element of value which can be and must be taxed. Utilizing a market rate of return which includes expectations of future growth but projecting income without growth results in an undervaluation of the assets.

There can be little question that plaintiff's future income will grow. Mr. Maude's data established inflationary growth based on history (Exhibit A, at 31). Plaintiff's Annual Reports to the FCC show a constant growth in telephone operating income (Exhibits 2 through 6). Similarly, plaintiff's operating income as reported in plaintiff's appraisal reports show a growth pattern. (Exhibit 16, at B-1, and Exhibit 17, at B-1). Consequently, the court must conclude that Dr. Davis' indicators of value by the income approach fail to reflect all of the value inherent in the existing assets.

*Correlation.* For the January 1, 1983, assessment date, Mr. Maude correlated values based on a cost indicator of $139,704,400 and income indicators ranging from $111,454 to $117,984. Without applying any specific percentages or weights to any of the indicators, his conclusion or opinion of value was $127,647,000 for the system. By contrast, Dr. Davis used the following three indicators with a resulting opinion of value for the system:

"

| Approach | Value Estimate | | Weighting | Weighted Average |
|---|---|---|---|---|
| Stock and debt | $94,594,000 | × | 20% | = $18,918,800 |
| Income | $97,087,000 | × | 40% | = $38,834,800 |
| Cost | $97,087,000 | × | 40% | = $38,834,800 |
| | | | | $96,588,400 |
| | | | SAY | $96,590,000" |

(Exhibit 16, at 8.)

Based on the court's analysis of the evidence, its finding with regard to the specific factors discussed above and its judgment as to the weight to be given the specific and general evidence, the court finds that the 1983 indicators of value are as follows:

| | | |
|---|---|---|
| Stock and debt | $ 94,594,000 × 20% | $18,918,800 |
| Cost | $139,704,400 × 40% | $55,881,760 |
| Income | $117,500,000 × 40% | $47,000,000 |
| | | $121,800,560 |

Based on these calculations, the court finds that the true cash value of the plaintiff's system as of January 1, 1983, is $122,000,000.

Similarly, with regard to the 1984 year, the court finds that the indicators of value are as follows:

| | | |
|---|---|---|
| Stock and debt | $ 98,692,000 × 20% | $19,738,400 |
| Cost | 137,395,500 × 40% | 54,958,200 |
| Income[7] | 125,000,000 × 40% | 50,000,000 |
| | | $124,696,600 |

Based upon these indications of value, the court finds that the value of plaintiff's system as of January 1, 1984, was $125,000,000.

Utilizing these findings, defendant will make the necessary calculations to allocate the correct values to Oregon and submit such calculations to the court in accordance with Tax Court Rule 65.

___

[7] The court has determined that a lesser projected income should be used than that utilized by Mr. Maude in recognition of the unusual income received by plaintiff from the AT&T break up.