Decision part for plaintiff, part for defendant rendered March 19, 1987.
Appeal pending.
This case concerns the value of plaintiff's Oregon property as of January 1, 1984. Plaintiff is a regulated public utility which generates and distributes electricity in six western states (Oregon, Washington, California, Idaho, Montana and Wyoming).[1]
Defendant is required by ORS 308.505 to 308.565 to assess plaintiff's property for ad valorem taxation. Since plaintiff's electric operations stretch across six states, the accepted method is to value plaintiff's electric utility property as an integrated operating unit and then allocate a portion of that value to Oregon.[2]
As a public utility, plaintiff is subject to comprehensive government regulation. This factor, combined with the interstate and integrated nature of the property holdings, greatly increases the complexity of the valuation issues. Although an electric utility is granted a monopoly in a particular geographical service area, thereby eliminating direct competition, it subjects itself to the limitations inherent in government regulation.
Government regulation, through Public Utility Commissions, affects both legal and economic characteristics of *Page 419 
the property. When valuing regulated public utility property for ad valorem taxation, it is necessary to recognize the effects of that regulation. Like the zoning of real estate, regulation of public utilities is designed to affect the property for the general benefit of society. Even accounting procedures imposed by government must be considered for their impact on the value of the property.
 "The court is not able to lay down a hard and fast rule that every aspect of regulatory accounting must be followed by the state in its property appraisal practices. However, in any instance in which a disregard of the required accounting procedures results in an addition to the appraiser's estimate of value which could not be realized by the potential seller because of regulatory limitations, the appraiser must be deemed to be in error and the appraisal, in this regard, is incorrect and unacceptable." Pacific Power Light Co. v. Dept. of Rev., 7 OTR 203, 221 (1977).
Consequently, it is necessary to recognize that government regulation may move some value normally associated with privately held property into the public domain. To the extent that the value is in the public domain, it would not be taxed to the property owner. Tualatin Development v. Dept. of Rev.,256 Or. 323, 473 P.2d 660 (1970). On the other hand, also like zoning, government regulation may create value which is taxable to the owner. The ultimate test as established by the statutes and affirmed many times by this court is the test of the marketplace.
PRIOR CASE. Initially plaintiff contends that the prior case of Pacific Power Light Co. v. Dept. of Rev., 7 OTR 203
(1977), modified 286 Or. 529, 596 P.2d 912 (1979), precludes defendant from raising and the court from considering several issues in this case. This contention is frequently made in this court and deserves exposition.
1. It has long been the rule that in ad valorem taxation each tax year "stands on its own." Mittleman v. Commission, 2 OTR 105
(1965). The reasons for this are obvious: As the world turns, property values change. The selection of a single valuation date or assessment date during the course of a year is a matter of administrative necessity, not valuation theory. Thus, the determination of value for one date in one year *Page 420 
cannot be binding precedent for a property's value in a subsequent year.
Since taxation is an on-going process, the determination of value for ad valorem tax purposes on a year-to-year basis is fair to both taxpayer and government. Certainly neither party would wish to be burdened with a particular determination of value for the indefinite future. The art of valuation is too inexact and the variables too numerous to conclude that a determination by a court or administrative agency one year should be applied res judicata to the next.
In addition, the court's approval of the application of appraisal techniques, methods or theories in one case are not necessarily binding on other cases. What is appropriate or persuasive depends upon the evidence in a particular case.Bend Millwork v. Dept. of Revenue, 285 Or. 577, 592 P.2d 986
(1979); Southern Oregon Broadcasting Co. v. Dept. of Revenue,287 Or. 35, 597 P.2d 795 (1979).
The present case is an excellent example of the vagaries associated with this process. The dispute between the parties here is not so much with the basic data but with the inferences to be drawn therefrom. While some issues relate to what data is most appropriate or relevant, most issues are concerned with the relationship of the data to the market. That is, what effect does some fact or data have on the marketplace. This case is particularly difficult because in fact no real "market" for regulated electric utilities exists. Consequently, there is a great deal of speculation by the appraisers, based upon logic and reason. The unsettling fact is that based on logic and reason, the appraisers march off in opposite directions.
THREE APPROACHES. Due to the nature of the property involved, the two appraisers have applied modified versions of the three traditional approaches of valuation. In the absence of a recognized market for the sale of utility properties, the appraisers are unable to use the market comparison approach.
However, many electric utilities are publicly owned. Based on the assumption that the sum of a company's debt and equity represents the value of a company's assets, the appraisers look to the securities market as a surrogate market approach. This is commonly referred to as the stock and debt approach. *Page 421 
The traditional cost approach, premised upon the principle of substitution, must be modified to recognize the limitations imposed by virtue of regulation. Rather than using reproduction or replacement cost new less depreciation, the appraisers utilize historical cost less depreciation (HCLD) which is the measure by which the PUC determines the rate of return to be allowed.[3]
The traditional income approach may be applied without "modification" but the application is complex. Due to regulatory accounting procedures, the effect of income tax laws and regulations and the capital markets, it is extremely difficult, as will be seen below, to derive a satisfactory indication of value by the income approach.
The above-mentioned complexities and modifications render the process of correlation most difficult. Except for certain fundamental tests and clear facts, the process otherwise might resemble a "good guess."
SPECIAL CATEGORIES OF PROPERTIES. Regulatory accounting for several types of properties owned by plaintiff requires additional explanation. These particular properties fall into three general categories as follows:
1. "Zero Capital Cost" Property. A basic premise of PUC regulatory philosophy is that utilities are allowed to earn a reasonable rate of return on invested capital. If property has no capital cost, no return is allowed. There are three types of properties in this case which are deemed to have no capital cost. The first of these is property purchased with funds held for "deferred income taxes." Federal income tax laws provide a more accelerated rate of depreciation than most property actually experiences. Plaintiff recognizes, under its normalized accounting procedures, that while accelerated depreciation saves income taxes now, plaintiff will pay higher taxes in the future when its tax depreciation is used up. Hence, an account is created for "deferred income taxes" (DIT). The amount of taxes thus saved currently may be invested in property to produce and transmit electricity. However, in the PUC's eyes that property cost the utility nothing, so no return is allowed to be earned thereon. *Page 422 
This same rationale is applied by the PUC with regard to property purchased with funds attributable to investment tax credits (ITC) under the Internal Revenue Code.
The third category of "zero capital cost" property is known as contributions in aid of construction (CIAC). Under PUC regulation, plaintiff is required to furnish certain customers with electrical service only if the customers are willing to fund part of the capital cost of bringing the electrical service to their property. The shack in the mountains or the remotely located industrial plant cannot simply demand miles of transmission lines and substations without sharing some of the cost. When the customer puts up, for example, 50 percent of the cost of a transmission line to its property, that 50 percent does not cost plaintiff anything in the way of capital. Consequently, the PUC does not allow plaintiff to earn a return on that portion of the cost.
2. 2. Property Not In Service. A second basic premise of regulation is to allow a utility to earn a return only on property which is reasonably necessary and actually providing utility service.
 "No public utility shall, directly or indirectly, by any device, charge, demand, collect or receive from any customer rates which are derived from a rate base which includes within it any construction, building, installation or real or personal property not presently used for providing utility service to the customer." (ORS 757.355.)
The largest type of property in this category is construction work in progress (CWIP). When plaintiff constructs new property, such as a generating facility, it is not included in plaintiff's rate base until it is actually placed in service. Even then, it may not be allowed in the rate base until plaintiff establishes that it is reasonably necessary to its operation.
A second type of property in this category is property held for future use (PHFU). This is usually bare land which the utility anticipates will be needed in the future but is not presently utilized in providing its electrical service. As long as such property is not used, the PUC will not allow plaintiff to earn a return thereon.
3. 3. Leased Property. This category is probably the *Page 423 
simplest and clearest to identify and deal with. Since leased property is not owned by plaintiff, it is not included in plaintiff's rate base. Lease payments made by plaintiff to a lessor are deducted as operating expenses. However, ORS 308.517
specifically provides that leased property shall be assessed "to the property user." Thus, by reason of the tax statute only, the value of leased property must be assessed to plaintiff.
The three categories of property described above must be silhouetted against each of the three approaches to value in order to properly determine their effect on each indicator of value. While the three approaches to value are not sacrosanct, they are separate and distinct from each other. See American Institute of Real Estate Appraisers, The Appraisal of RealEstate 51 (8th ed, rev 1983). Thus each category must be considered from three separate perspectives. For example, assume an electric utility has one hydro plant operating and earning $1 million in income. It also has a second identical hydro plant under construction, 99 percent complete. If the second hydro plant is included in HCLD, the cost approach will give an indication of the value of the total properties. In theory, the stock and debt approach should also reflect the value of all the property since the securities market would recognize that a second generating plant is almost complete. However, the income approach will not reflect any value attributable to the second hydro plant under construction. To adjust for this, income must be imputed to the plant under construction, discounted for delays and risks before earnings commence, and then capitalized to provide an indicator of value.
It is important to keep in mind that each approach should reflect the full value of all taxable property without looking to the other approaches. If this is not done, in the correlation process the value indicators become diluted or distorted as to their weight.
Due to the complexity and the sheer mass of data involved, this opinion cannot discuss all the points in dispute. A written resolution of all points of dispute where the transcript exceeds 1,500 pages and the documents make a stack 18 inches high would be of little benefit. The court will resolve only those issues of significance in each of the three *Page 424 
approaches and then make a determination based on its view of the correlation of those approaches.
STOCK AND DEBT APPROACH. As mentioned above, the debt and equity of a publicly owned company reflects value to the capital investing public. In theory, the investors evaluate a company's performance and expectations of earnings. While the basic assumption underlying this approach is subject to question, the method is an accepted substitute for the market approach.[4]
The problem in this case is not ascertaining the value of plaintiff's stocks and bonds, but allocating those ascertained values to the various parts of the company. Since the regulated electric utility business is only a part of PacifiCorp, the other half consisting of a telephone company and coal operations, the question is how to allocate the stock and bond values. Plaintiff's appraiser, Dr. Davis, adopted the average of two methods: the asset influence method and the income influence method. Dr. Davis' estimation concludes that $2,539,000,000 should be allocated to the electric utility business. Implicit in this allocation is the value assigned by the market to the nonelectric business. (Exhibit 20.) This is consistent with other evidence that the electric utility, at the date in issue, tended to depress the market value of PacifiCorp's stock. (Exhibit QQ.)
Defendant's appraiser, Mr. Maude, allocated the value to the electric utility based on relative book values (adjusted for water and steam heat and leased property). Mr. Maude's indicator of value was $2,550,021,000. (Exhibit II, at 60.)
Most of the difference between the two appraisers' indications of value can be attributed to Mr. Maude's adding contributions in aid of construction (CIAC) of $12,024,000. (Exhibit II, at 64.) It should be noted that both appraisers added the value of leased property in arriving at their stock and debt indication of value, recognizing that leased property would not be reflected in the debt or equity of the company. Although CIAC are owned by the company, they are not found *Page 425 
in the financial or FERC-1 form statements. Apparently this is because when CIAC are received by the company they are shown as a credit but are later deducted when construction expenses are incurred. Thus, in theory, CIAC are not found in the company's books after construction is completed.
Defendant argues that CIAC must be added to the stock and debt indicator because that account represents assets which are taxable to plaintiff as the owner and user. Plaintiff, on the other hand, maintains that since CIAC can earn no income, CIAC have no value as to the capital market. Hence, the market assigns no value to CIAC because they earn nothing under regulatory accounting.
4. If the theory of the stock and debt approach is valid, the value of any CIAC is reflected in the values established by the securities market and, therefore, no addition should be made. The theory assumes that the market is aware of CIAC. If the market sees CIAC as having value, that value would be included in the price of the stock and the debt. It is inconsistent with the theory of the stock and debt approach to add the cost of CIAC.
There were numerous other points of dispute between the parties relative to the application of the stock and debt approach. For example, Dr. Davis questioned his own stock and debt indicator (Exhibit 21) but was unwilling to rely upon his "check approach" (Tr 316). Plaintiff asserted a number of errors made by defendant in its stock and debt approach, yet both indicators are relatively close when the CIAC are removed from defendant's indicator. On the whole, the court finds that the value indicated by the stock and debt approach is $2,539,000,000.
COST APPROACH. Both parties adopted plaintiff's historical cost less depreciation taken from the FERC-1 forms (Exhibit 2(a)) as their basis for a cost approach. Dr. Davis found that the indicated value by the cost approach was $2,429,000,000, while Mr. Maude found the cost indicator to be $2,583,368,000, or a difference of $154,368,000. Most of this difference is attributable to the deduction by Dr. Davis of an amount for obsolescence. He deducted amounts of deferred income taxes (DIT) and investment tax credits (ITC) totaling $149,462,646. Since the costs come from a number of points in *Page 426 
the plaintiff's accounting reports, there are some differences in the amounts each appraiser used even without DIT and ITC.
The main issue in the cost approach, then, is whether DIT and ITC should be deducted as "surrogate measures" of obsolescence.
As mentioned above, the tax savings realized from accelerated depreciation (DIT) and investment tax credits (ITC) are looked upon by the PUC as "interest free loans" from the government. Although these funds can be distributed to shareholders, it appears that the parties assume they have been invested in tangible property and constitute part of the utility plant. Mr. Maude testified that DIT and ITC "represents approximately seven percent of the total plant." (Tr 881.)
Dr. Davis testified that, due to regulation, plaintiff is unable to earn on the property purchased with funds in the DIT and ITC category. In his view, if property is unable to earn income, it is as if it were obsolete. Dr. Davis rationalized that a buyer would not pay cost for all of the property if only part of the property could earn an allowed rate of return. A buyer who did so would be guaranteeing that he would earn less than the allowed rate of return. In response, defendant contends that DIT and ITC have no relationship to obsolescence. Defendant correctly points to the principle of substitution which underlies the cost approach. Defendant fails, however, to relate the principle of substitution to the facts here.
Under the principle of substitution, "a buyer would not pay more for one property than for another that was equally desirable." American Institute of Real Estate Appraisers,The Appraisal of Real Estate 24 (8th ed, 1983). If amounts for DIT and ITC represent the cost of tangible taxable property as defendant's appraiser assumes, the question is whether a buyer would pay anything for such property if the PUC will not allow it to earn a return thereon. While it is part of the integrated pool of assets which produce and transmit electricity to customers, it "earns" nothing. If the total cost of that pool of assets is $2,500,000,000 but the PUC allows the owner to earn on only $2,000,000,000, why would a purchaser pay more than the $2,000,000,000? To do so would insure the *Page 427 
purchaser that he would earn less than the allowed (presumed market) rate of return.
Mr. Maude reasoned that to exclude such items of property from the cost approach exempts that property from taxation. (Tr 882.) This point brings into focus the conflict between the regulatory statutes and tax statutes. The regulatory statutes, like zoning statutes, remove some of the taxable value from plaintiff's side of the ledger and shifts it into the public domain. On the other hand, the tax statutes require that the value of property be assessed to the "user." Are ORS 308.510
and ORS 308.515 to be construed as taxing to the user all rights in the property, thereby ignoring the effect of government regulation? To do so would depart from the true cash value standard.
5. In the court's view, the overriding principle or test is market value. If the market would not pay for property because the PUC will not allow that property to earn a return, no taxable value can be assessed to the regulated owner. Defendant's position does not comport with reality. A purchaser would not pay the full price for the unit on a cost basis when the amounts for DIT and ITC will never be allowed to earn a return. By comparison, property in the CWIP and PHFU categories do have market value because they can become part of the recognized earning rate base. A buyer would undoubtedly discount the value of those properties from their cost based upon anticipated delays and perceived risks in getting them operating and into rate base. However, because of regulation, DIT and ITC property will not become part of the rate base. The court can see no reason why a buyer would pay cost for assets upon which he cannot earn a return.
It is true that the tangible property represented by the amounts in DIT and ITC are part of the plaintiff's operational system. Those properties may in fact produce or deliver electricity. However, if they have any market value, it will have to be reflected as a part of the total system value when measured by the other approaches to value. It is probably misleading to speak of these circumstances as a form of "obsolescence." It would be more accurate to view such property as not having any value in the marketplace because government regulation has shifted the economic benefit to the public. *Page 428 
In light of the above, it appears to the court that to the extent DIT and ITC represent tangible property, the cost of which is part of HCLD, then DIT and ITC should be excluded from the cost approach.[5] This results in an indicated value of $2,433,053,000 for the cost approach.
INCOME APPROACH. Due to its complexity, any discussion of the income approach in this case must be broken down into comprehensible parts. Comparing the methods used by the two appraisers should assist in understanding the issues raised.
Dr. Davis took as his measure of income the reported net operating income of the company (NOI). He explained that he assumed that replacement expenses generally offset depreciation and amortization and, therefore, NOI represented free cash flow. In attempting to project the income of the plaintiff for the future, Dr. Davis considered the past five years (1979 through 1983) in four different categories: average income, average income adjusted for changes in net utility plant, weighted average income and linear trend line analysis. He also considered the plaintiff's performance ratio, that is, the ratio between gross and net income, but rejected that indicator as too low because of the recent nuclear plant write-offs. Based on his analysis, he concluded that the reasonable projected income was $270,000,000. To this he added estimated income from leased property, arriving at a total income of $288,000,000 to capitalize.
After selecting a capital structure, he ascertained that the weighted average cost of capital should be 15 percent. Using the standard income capitalization formula of Value equals Income divided by Rate, he divided the estimated income of $288,000,000 by 15 percent and arrived at an income indicator of $1,920,000,000.[6] *Page 429 
By comparison, Mr. Maude used three perpetuity models, discounting future cash flows to their present value. To assure that the discount rate and the projected incomes were properly "matched," one model adjusted the rate to match a projected fixed income and one model adjusted the income to match a market rate of interest. His third model was a limited life model which projected expected future benefits flowing from the current assets without regard to any future investments or replacements. Based on his estimated capital structure, Mr. Maude found that the weighted average cost of capital was 14 percent. Mr. Maude then determined or estimated annual net income to be $267,000,000. Applying these figures to his models, he arrived at an indicated value of $2,262,712,000 for the rate adjusted model, $2,269,240,000 for the income adjusted model and $1,990,157,000 for the limited life model.
To the above indicators of value Mr. Maude also added CWIP, CIAC, PHFU and leased property. Since these special categories of property are not included in the rate base, he imputed income to them and then capitalized that income to arrive at an indication of value. Thus, his final indicators of value by the income approach ranged from $2,346,910,000 to $2,674,041,000.
The difference in methods and the conclusions of the two appraisers led to numerous disputes. The most fundamental dispute concerned growth, both as to whether growth was expected and whether it made any difference in the value of the property. Dr. Davis saw "no growth" and Mr. Maude saw "growth." Other issues revolved around the appropriate capital structure: the methods, the appropriate measures in determining cost of equity capital and numerous points in between.
Growth. Dr. Davis, in testifying for the plaintiff, appeared to rely on two reasons for not projecting growth in plaintiff's future income. Plaintiff introduced substantial evidence and testimony concerning competition, surplus power in the electrical power market, the decline in consumption and a decline in wholesale sales. Dr. Davis alluded to this evidence in projecting the future of the company. (Tr 185.) The second reason Dr. Davis gave for not projecting growth was his understanding that the state "cannot tax assets not in existence." It is necessary to consider both of these reasons in detail. *Page 430 
Beginning with the economic reason, Dr. Davis ignores the data contained in his appraisal report. The years 1979 through 1983 showed that plaintiff averaged overall 13 percent growth. When these figures are adjusted for change in net utility plant, they show that plaintiff experienced growth in excess of three percent annually despite the massive nuclear write-offs. (Exhibit 9, at B-1.) Examination of plaintiff's Form 10-K (Exhibit 2(b), at 32) management review shows "[i]ncome before extraordinary and cumulative effect item" was $75.6 million in 1979 and increased to $173 million in 1983. This indicates a compound growth rate of 23 percent for five years. Likewise, it appears that plaintiff increased its overall sales and net income during a period of time when its wholesale sales declined 27 percent.
The Pacific Northwest Utilities Conference Committee projected long-term growth in demand for the 20-year period from 1983 to the year 2003. These projections show that the "surplus" capacity was anticipated to disappear around 1986 or 1987. (Exhibit UU.) Plaintiff's own long-term load forecasts show a need for more capacity. (Exhibit VV.) Plaintiff projected 2.3 percent annual growth into the early 1990's. (Exhibit 28.) Mr. Benderly's testimony before the Public Utility Commission (Exhibit L) expected annual growth of 4.5 percent based on retained earnings (Tr 643). Although Mr. Warren, an employee of the Public Utility Commission, testified that the market was competitive (Tr 128) and dynamic (Tr 130), he did not say there would be no growth. Dr. Davis' own testimony shows that he did not look at the long-term load forecasts as of January 1, 1984 (Tr 1526). Dr. Davis admits that the market expects growth (Tr 417) and the market analysts expect growth (Tr 418). Based on this evidence, there is no question in the court's mind that plaintiff can and does expect growth in its income, the investors expect growth in plaintiff's dividends, and it would be ignoring reality to say that plaintiff's income was not expected to grow in the future.
Dr. Davis' second reason for not including growth in his projected income was his belief that the state cannot tax assets not in existence. Apparently because regulation establishes a fixed or "frozen asset base," Dr. Davis sees no possible future growth in or from that asset base. (Tr 417.) This view gives too much sway to regulation and not enough to the *Page 431 
market. In his testimony, Dr. Davis recognized that he was departing from the statutory test.
 "I think my answer would be that the appraiser has to read the marketplace and, however, the marketplace is not valuing the property in the same ballpark we are." (Tr 418.)
"* * * * *
 "[A]n investor is perceiving growth in a completely different context." (Tr 420.)
The PUC's regulation of plaintiff's operations, including its rates, does not place value in "another ballpark." What we are concerned with here is the market's perceptions as to value. If the market expects growth in plaintiff's future income, those expectations affect the market's impressions with regard to risk, rate of return, possible appreciation and return of capital. Dr. Davis cites no authority for departing from the market standard. There can be none. The test is what the market sees, not what an appraiser sees.
6. In discussing this same issue in a prior case, this court has explained that the concept of value in this context is based on the anticipation of future benefits. The present value of property is increased because of the property's potential for increasing benefits in the future. When the market recognizes that the future income from the existing property can increase or will increase, the present value of the existing property increases. United Telephone Co. v. Dept. ofRev., 10 OTR 333 (1986).
Contrary to Dr. Davis, Mr. Maude projected growth in plaintiff's future income. However, Mr. Maude's projected growth was based on an increase in debt costs. Mr. Maude reasoned that because the current income is based on the imbedded rate of debt and that the imbedded rate of debt is less than the current cost of debt, the present income does not reflect the potential future income. (Exhibit II, at 17.) Mr. Maude projected that, based on the increase in rates from 1951 through 1981, the cost of debt would increase due to inflation at the rate of five percent per year. Since he attributes approximately one-half of the income to the capital invested in debt, he projected an increase in net income of 2 1/2 percent per year.
The court is not persuaded that the cost of debt will *Page 432 
continue to increase five percent per year. Mr. Maude's basic premise rests on an increase in interest rates over the 30-year period from 1951 to 1981. However, his reasoning implies that at some time in the past the interest rate was zero and at some time in the future the interest rate will be 100 percent. Unless the court is totally without understanding on this point, it cannot find that interest rates are so related to inflation.[7] Plaintiff points out that Mr. Maude's reasoning results in absurd conclusions by the year 2003 as to interest rates.
Mr. Nyegaard, an employee of the Public Utility Commission, testified that the historic payout ratio for plaintiff is 67 percent. By retaining 33 percent, plaintiff experiences an expected growth of 4.5 percent annually. (Tr 643.) Likewise, as mentioned previously, Mr. Benderly, testifying for plaintiff before the PUC, anticipated a growth rate of 4.5 percent, as a result of retained earnings, which is about the same as the growth in declared dividends from 1970 to 1980 (Exhibit L and Tr 643). He also testified that the implicit assumption "is that investors do not expect the rate of return * * * to increase" indefinitely into the future. Under these circumstances, the court finds that the preponderance of the evidence shows that plaintiff's income is expected to grow at approximately 4.5 percent per year.
Cost of Capital. To develop an indication of value by the income approach the appraiser must ascertain what the market requires as a return on investment in the particular property. In this case, it is impossible to derive a rate from market sales because there are none. Consequently, the appraisers must look to the capital market for an indication of the returns expected on investments. As with most electric utilities, plaintiff's capital is a composite of long-term debt, preferred stock and common stock (equity). Since each class of capital demands a different interest rate, the appraiser must estimate the appropriate proportion of each, or appropriate capital structure, in order to ascertain the appropriate weighted average cost of capital.
In this case both appraisers looked at the capital *Page 433 
structure of other electric utilities and attempted to ascertain a capital structure which a prospective purchaser would adopt. A comparison of the two appraisers' projected capital structures with plaintiff's actual capital structure is as follows:
 Dr. Davis Mr. Maude[8] Plaintiff's Actual --------- --------- ------------------
Debt 48.3% 46.6% 46.86% Preferred 11.4% 11.2% 14.01% Equity 40.3% 42.2% 39.13%
[8] Mr. Maude showed two different capital structures, one on page 11 and one on page 33 of Exhibit II, but the one on page 11 appears to be a typographical error since the schedule on page 33 was utilized in the calculations on page 15.
In attempting to determine which capital structure is the most appropriate, it is necessary to recognize the direct relationship between the debt-equity ratio and the cost of capital. For example, Mr. Lanz, in testifying before the PUC on behalf of plaintiff, indicated that the overall cost of capital is less if equity is increased to more than 36 percent. (Exhibit X, at 288; Tr 687.) Thus selection of an appropriate capital structure will influence the appraiser's selection of an appropriate weighted average cost of capital.
In looking to the appraisers' work product, it appears that Dr. Davis used an industry average capital structure based on Value Line data (Exhibit 9, C-1.) No detailed explanation or break-down has been provided to support his conclusion. Mr. Maude based his estimate of capital structure on other utilities listed on page 33 of Exhibit II. A study of this list indicates a relationship between a company's bond rating (Moody's bond rating) and its capital structure. The greater proportion of debt results in a lower bond rating and thus a higher interest rate. Likewise, the highest bond ratings are associated with companies with a high percent of equity. If plaintiff's actual bond rating as of January 1, 1984, was A3 (Exhibit 7), it appears to the court that the most reasonable capital structure would be that proposed by Mr. Maude. In that context, a prospective purchaser would strive for a capital structure which has a high bond rating and low debt cost. Companies with lower ratings show equity in the 30 percent range and debt in the 50 percent range. Those with the higher bond ratings have equity ranges of 42 to 48 percent and debt in the 40 percent range. *Page 434 
 Cost of Equity Capital. Although there were some deviations or differences between the estimates of the appraisers for the cost of long-term debt and preferred stock, the differences are not great and do not constitute an issue of great significance. For comparison, the two categories are as follows:
 Dr. Davis Mr. Maude --------- ---------
Long-term debt 13.52% 13.0% Preferred stock 13.34% 12.9%
In evaluating these items the court adopts Mr. Maude's estimates because the capital structure adopted by the court should result in debt costs in the lower range.
The real dispute in the income approach, where the formulas fly and financial concepts loom large in importance, is in ascertaining the cost of equity capital. Much of that dispute arises from the difficulty of estimating the amount of risk associated with regulated electric utilities.
Dr. Davis used two methods to estimate the cost of equity capital. His first method, upon which he placed primary reliance (Tr 229), is the risk-premium method. That method first determines a risk-free rate of interest, to which is added a premium for risk based on equity investments in the industry. Dr. Davis used 30-year government bonds as the risk-free rate to which he added a risk premium which he took from the Ibbotson-Sinquefield Study.[9] Dr. Davis also used a capital asset pricing model (CAPM) which is a finance model used for determining the cost associated with a particular investment.
Mr. Maude utilized five tests in determining his estimated cost of equity capital. Two of his tests were based upon the earnings-price ratio and the earnings-book ratios of electric utilities. The other three tests consist of a risk-premium model similar to Dr. Davis', a capital asset pricing model and a discounted cash flow (DCF) model.
In attempting to measure risk, financial analysts have found it useful to adopt a concept known as "beta" which *Page 435 
is used to describe the sensitivity of securities to price changes. Brealey and Myers, Principles of Corporate Finance 126 (2d ed, 1984). In this case, it is necessary to consider what is the proper beta associated with plaintiff's common stock. The concept of beta is expressed as a number with the whole number one as an average of all industry. (A beta greater than one indicates a greater than average risk while a beta of less than one indicates a less than average risk.) In this case, defendant and its witnesses criticized Dr. Davis because he assumed a beta of one in his risk premium test. (Tr 231-232 and 689.) Mr. Nyegaard, a Public Utility Commission employee, testified that no regulated utility claims a beta as high as one. Presumably this is because regulated utilities enjoy relatively stable earnings. In this case, Mr. Nyegaard testified that he ascertained a beta of .48 for the plaintiff (Tr 680).
The consequence of the choice of beta can be seen, at least in part, in this instance to the extent that Dr. Davis, utilizing a beta of one in his risk premium test, determined an equity cost of 17.25 percent. At the same time, while Mr. Nyegaard found a beta of .48, he ascertained an equity cost of 14.4 percent to 14.6 percent. (Exhibit T, at 22.) It is of more than passing interest that the Public Utility Commission found and allowed an equity cost of 15 percent as of January 1, 1984. (Tr 683.)
The parties dispute not only the appropriate beta to use but also the methodology. Dr. Davis used 30-year government bonds as the risk-free rate. Mr. Nyegaard testified that the maturity period of such bonds is so long they are not truly risk free. (Tr 734.) Whether this dispute is resolvable is not clear. The court does note that the Ibbotson-Sinquefield Study on which Dr. Davis relies indicates that:
 "Thus the details of estimating the long-term cost of capital are not totally resolved * * *." (Exhibit 35, at 87.)
In the CAPM approach, Dr. Davis did use a beta of less than one. In that approach, he used a beta of .65 and a risk premium of 8.1 percent to result in a cost of equity capital of 17.11 percent. (Exhibit 16.) The court questions the validity of this exercise in light of his assumption that beta was one in the risk-premium method. By comparison, Mr. Nyegaard used a beta of .48 and a risk premium of 6.5 percent in the CAPM *Page 436 
approach to arrive at an estimated cost of equity capital of 14.4 percent. (Exhibit T, at 22.) Mr. Nyegaard's testimony before the PUC also indicated that plaintiff agreed that 14.6 percent, requested by plaintiff on an interim basis, was reasonable. (Exhibit T, at 22.)
Viewing all of the circumstances present, including the fact that as of the assessment date in question plaintiff had shed itself of its nuclear albatross and was considerably more attractive to the market, the court believes that Mr. Maude's cost of equity of 15.2 percent is the most reasonable and probable. Dr. Davis' estimate of 17.25 percent appears too high for a regulated utility having plaintiff's characteristics and a proposed capital structure with 42.2 percent equity.
Based upon the several conclusions of the court with regard to capital structure, debt costs and the cost of equity, the court finds that the appropriate weighted average cost of capital (WACC) in this case should be 14 percent. The court notes that this is higher than the calculated WACC which would result from Mr. Maude's capital structure and estimated capital costs.
Matching Issue. One question is whether either appraiser properly utilized the appropriate measure of income with the appropriate capitalization rate. Dr. Davis' direct capitalization method converted a single year's income into an indication of true cash value. However, the rate which he used was not derived from market sales but was based on data from the capital market, i.e., price-earnings ratios. Although Dr. Davis admits investors expect growth in the company's income, he did not project growth in the income capitalized.
 "[T]he market, when looking at PPL's stock price via Value Line, if you will, shows a growth rate in the DCF, that is D1 over Po plus g. Therefore, the investor is perceiving growth in that dividend and therefore the earnings, revenues, the whole nine yards for PPL. The investor anticipates future growth there. I would not argue with that one minute." (Tr 417.)
If the market expects growth, the court fails to see how Dr. Davis can use any other measurement. To use a capitalization rate derived from a market which expects growth in the subject property's income but to apply it to an *Page 437 
income with no projected growth results in an undervaluation of the assets.
Maude's Additions for CWIP, PHFU and Leased Property.
Plaintiff contends that one of the major errors in defendant's income approach is adding value for properties within the CWIP, PHFU and leased accounts. Each of these items requires separate consideration.
(a) CWIP. Plaintiff claims that the Supreme Court holding inPacific Power Light Co. v. Dept. of Rev., supra, precludes defendant from adding any value for CWIP in this case. Plaintiff claims too much for that holding. That case did not hold that CWIP should be excluded from the income approach. In fact, the court pointed out that:
 "[P]laintiff actually somewhat agreed with defendant's perspective of a reasonable, knowledgeable buyer taking into consideration income to be produced by property not producing as of the assessment date." Pacific Power Light Co. v. Dept. of Rev., supra, at 549.
In this case, the evidence shows that plaintiff had almost $200 million of construction work in progress, most of which was involved in two generating units, Colstrips 3 and 4, which were virtually complete. Certainly a prospective purchaser would realize that the current income does not reflect the value of that CWIP. In order for the income approach to adequately and fully reflect the value of all the property involved, some value must be added for construction work in progress. This can be done by either adding it at its cost or income can be imputed and capitalized to indicate value. As noted by the authoritative text on the subject, "[r]esidual techniques may be used in both direct and yield capitalization to value property components separately." American Institute of Real Estate Appraisers, The Appraisal of Real Estate 349 (8th ed, 1983).
7. Plaintiff claims that because some CWIP may never go into rate base, "it is entirely inappropriate to make any adjustment to the income stream * * * from CWIP." (Plaintiff's Opening Brief, at 49.) This is an oversimplification in the other direction. No buyer would ignore CWIP, therefore, no appraiser can ignore CWIP. If circumstances portend delays before CWIP begins producing income or risk that it may *Page 438 
never be added to rate base, those circumstances must be weighed to discount its present value. That is what a prospective buyer would do.
There is no question as to the amount spent on CWIP. There is no question that the assets are in existence and are taxable. When these facts are established, plaintiff has the burden of proving any diminution in value due to delays or risks. To claim a value lower than cost due to delays or risks regarding production is like claiming obsolescence in property; the party making the claim has the burden of proof. In this case, plaintiff's appraiser accepted CWIP in his cost approach without question. (Exhibit 9, at D-1.) In order to establish a lower value, plaintiff has the burden of introducing the kinds of specific data which establishes with some certainty the lower value. "To prevail in such a case, the plaintiff must be prepared to reveal its underlying assumptions and data and defend them effectively." Publishers Paper Co. v. Dept. ofRev., 270 Or. 737, 754, 530 P.2d 88 (1974.) Here plaintiff introduced evidence to indicate that the major items in the CWIP category (i.e., the interest in the coal-fired plants) are not yet in rate base in every state. Plaintiff did not, however, introduce specific facts and figures to permit an informed evaluation of the effect of the delays and risks on the value of the property. In the absence of any such evidence, the fact that plaintiff has expended the funds carries great weight. Although the interest in the Colstrips 3 and 4 are the only specific kinds of properties described, it seems clear that the CWIP in this case does not fall in the same risk category as the nuclear plants in the prior case.
Assets in the property held for future use (PHFU) category are to be viewed differently. This property consists mostly of land which plaintiff anticipates it will need for its business operations in the future. There is no evidence to indicate that PHFU is restricted in use to electric utility operations. Land can be disposed of and used by the purchaser for other uses. Again, in the absence of any evidence of restrictions, this property must be considered to be worth its indicated cost.
Leased Property. In the income approach, plaintiff's appraiser imputed annual income of $17,893,000 to leased property while defendant's appraiser imputed an *Page 439 
income of $20,562,000 to such property. The difference is that plaintiff purports to value the lessor's interest only since, plaintiff contends, the lessee's interest is already reflected in plaintiff's operating income. (Plaintiff's Opening Brief, at 50.) Plaintiff's argument implicitly acknowledges that the entire value of leased property is to be assessed to plaintiff. Based on the evidence adduced, the court does not agree with plaintiff's analysis. Plaintiff's appraiser imputes a return of only 10.37 percent on the net book cost of the leased plant. There is no evidence that 10.37 percent constitutes a reasonable rate of return to the lessor or that the lease payments are less than market. The test is what a prospective purchaser would demand for his investment in such property. Assuming such property's use is subject to regulation and a limited return, Mr. Maude's imputing an income at the allowed rate of return seems more reasonable.
8. Contributions In Aid of Construction (CIAC). Income should not be imputed to CIAC property in order to add its capitalized value to the income approach. Unlike CWIP, CIAC property will never be added to rate base. Defendant's own appraisal report indicates "this property is owned and used by the company in the furtherance of its electric service but does not appear on the company's books as an investment nor is there any income, more than operating expenses, generated by it." (Exhibit II, at 31.)
If CIAC can never be added to rate base and generates only its operating expenses, any value it has to plaintiff's operations must be already reflected in plaintiff's net operating income. It is inappropriate to impute additional income since the property cannot produce any additional income. A reasonable buyer would not pay more for the property than the actual income justifies.
Summary of Income Approach. In summary, the court finds that Dr. Davis' failure to account for growth in plaintiff's future income resulted in an undervaluation of the assets by the income approach. Although the court does not agree with Mr. Maude's analysis of expected growth based on increased debt cost caused by inflation, the court does find expected growth in income at least equal to the growth anticipated by Mr. Maude. Having adopted Mr. Maude's capital structure and found that his estimates of the cost of long-term *Page 440 
debt, preferred and equity capital were the most reasonable and probable, the court found a weighted average cost of capital of 14 percent. The court has also found that income should be imputed to CWIP, PHFU and leased property in order to properly reflect the full value of all taxable property by the income approach. These conclusions lead the court to find that the most reasonable indications of value by the income approach are as follows:
 Maude's income adjusted model $2,269,240,000 Construction work in progress 213,893,000 Property held for future use 2,491,000 Leased property 174,770,000 -------------- Total income indicator $2,660,394,000
 CORRELATION. In attempting to correlate the values indicated by the three approaches, it is appropriate to comment upon two points. First, the absence of a market for a large integrated pool of assets such as is in issue here, combined with governmental regulation of those assets, of necessity results in much speculation as to what a prospective purchaser would do with regard to particular issues. For example, how would a purchaser view assets which are used in the business but for which the PUC allows no earnings? In these circumstances, it appears that greater reliance is placed on logic and reasoning as to what a reasonable buyer would do and less on factual data from the market. This leads the court to place greater weight upon those undisputed facts which establish the major pole positions or bench marks.
Second, plaintiff's posture before the regulatory agency and the taxing authorities is, of necessity, somewhat different. While defendant uses plaintiff's submissions to the PUC as evidence in support of defendant's position, it is clear that the PUC abides by different standards and values. By statute, the PUC is concerned with compensating the investors for risk, attracting capital and providing services to customers at a fair and reasonable rate. (ORS 756.040; Tr 630.) The department, on the other hand, is charged with the duty of ascertaining the fair market value of the property as a unit. While there is much overlapping, the distinctions need be kept in mind.
In attempting to determine the weight to be given to *Page 441 
each indicator of value, an appraiser considers the reliability of the data, how closely the approach relates to the market's transactions and the probabilities of error. In this case, the stock and debt approach is a diluted indication of the market's view of the property. This diluted view is further blurred by the fact that the securities pertain to the whole diversified company and not simply the electric utility operations. The fuzziness thus associated with the indicator causes less weight to be attributed to it.
The cost approach has much to recommend it because it is the economic base by which the regulator determines the allowed rate of return. In addition, there are fewer questions as to the accuracy of the numbers. Although in reality a prospective purchaser cannot buy a substitute, at least for a particular geographical area, that weakness is offset by the direct correlation between regulation of rates and cost. Thus substantial weight should be given to the cost approach.
The strength of the income approach lies in the fact that it purports to measure the very benefits which create value. Because of this, one may reasonably assume that the market places great weight upon this indication of value. The primary weaknesses of this approach arise from: (1) The many steps or points which require the exercise of judgment, and (2) the process of capitalization, which projects a small rate onto a large screen in indicating value, thereby greatly magnifying any error.
With the above considerations in mind and having evaluated the opinions, reasoning and judgments of the appraisers as well as the other evidence introduced, the court finds that the appropriate indications of value are as follows:
Indicated Proportionate Approach Value Weight Value -------- ----- ------ -----
Historical cost less depreciation $2,433,053,000 45% $1,094,873,800 Stock and debt 2,539,000,000 10% 253,900,000 Income 2,660,394,000 45% 1,197,177,300 ------------- Total $2,545,951,100
The court finds that the true cash value of the subject unit as of January 1, 1984, was $2,545,900,000. Defendant will prepare calculations allocating the appropriate portion of such *Page 442 
value to Oregon and submit such calculations in accordance with Tax Court Rule 65.
[1] "Pacific Power Light" is an assumed business name for the electric operations of PacifiCorp, a Maine corporation. The electric utility operations constitute slightly more than half of PacifiCorp's business activity.
[2] Initially, when plaintiff appealed, defendant claimed that the appeal was late. By stipulation of the parties the matter was remanded to Department of Revenue with the court retaining jurisdiction. The department affirmed the assessed value and the case has now been tried by this court on the merits.
[3] Actually, the PUC establishes an allowed rate of return on a "rate base," which is usually a figure less than HCLD.
[4] Dr. Ring in Valuation of Real Estate 426 (3rd ed, 1986), points out that the market is valuing an admixture of taxable and nontaxable assets. In addition, the market's expectations fluctuate for reasons unrelated to the value of the assets.
[5] The court acknowledges defendant's arguments that DIT and ITC are simply accounting entries representing federal income taxes saved. However, both appraisers appear to have assumed that such funds are in fact invested in utility plant. In the absence of any evidence that such funds have been distributed to shareholders or otherwise disposed of, the court must accept the assumption adopted by both appraisers.
[6] Although Dr. Davis used direct capitalization and Mr. Maude used a discount process, it appears that the rate in either case should be the same. "In capitalization in perpetuity, the discount rate and the overall cap rate are the same, because the income is expected to last forever or because the original investment is presumed to be recoverable at the termination of the investment." Akerson, Capitalization Theory and Techniques
56.
[7] It is common knowledge that our economy has experienced inflation of three to five percent per year from 1979 to 1986 and yet during the same period the interest rates fell to less than 10 percent.
[9] Ibbotson-Sinquefield Study, published for use in the finance world as Stocks, Bonds, Bills and Inflation, 1986 Yearbook,Market Results for 1926 through 1985 (Exhibit 35) is an accepted authoritative work as to various risks and returns associated with particular industries in relationship to the market. *Page 443