Argued and submitted November 4, 1987, modified and remanded February 28, 1989

## UNITED TELEPHONE COMPANY OF THE NORTHWEST, INC.,
*Appellant - Cross-Respondent,*

*v.*

## DEPARTMENT OF REVENUE,
*Respondent - Cross-Appellant.*

(OTC 2037, 2209; SC S33678)

770 P2d 43

Thomas H. Nelson, Portland, argued the cause and filed the brief on behalf of the appellant - cross-respondent. With him on the brief were Leonard A. Girard, Joel A. Mullin and Stoel, Rives, Boley, Jones & Grey, Portland.

James C. Wallace, Assistant Attorney General, Salem, argued the cause and filed the brief on behalf of the respondent - cross-appellant. With him on the brief was Dave Frohnmayer, Attorney General, Salem.

GILLETTE, J.

## GILLETTE, J.

This is an *ad valorem* tax case in which this court is required once again to address questions associated with the valuation for tax purposes of property of a public utility. Plaintiff United Telephone Company of the Northwest, Inc. ("United"), challenges tax assessments by the defendant Department of Revenue ("Department") for the tax years 1983 and 1984, as those assessments were modified by the Oregon Tax Court. *United Telephone Co. v. Dept. of Rev.,* 10 OTR 333 (1986). United asserts that the Tax Court decision should be modified to lower United's tax burden for each of the two years because (1) that court and the Department failed to follow accounting precedents established by this court; (2) the Tax Court overstated United's value because it used approaches to valuation that were not justified by the evidence; and (3) the Tax Court failed to recognize and make allowance for economic obsolescence of a portion of United's property. In its cross-appeal, the Department challenges the Tax Court's decision to lower United's 1984 valuation in anticipation of certain negative consequences to United expected to result from deregulation of long distance telephone service. We modify the Tax Court judgment as follows:

|  | 1983 | 1984 |
|---|---|---|
| Tax Court Valuation | $122,000,000 | $125,000,000 |
| Supreme Court Valuation | $122,536,000 | $122,416,000 |

United is a public telephone company with its main offices in Hood River, Oregon. It is a wholly owned subsidiary of United Telecommunications, Inc., a large nonregulated and diversified company. United does business in Oregon and Washington. The business is integrated interstate, thus requiring that all taxable property, wherever located, first be valued before the Oregon portion, representing the taxable property located in Oregon, can be allocated. ORS 308.550(2); 308.555. The allocation is based on a formula established by the Western States Association of Tax Administrators.[1]

---

[1] The formula allocates the value in roughly the following proportions: 75 percent based on cost of property new; 15 percent based on operating revenue; and 10 percent based on net income. Neither the allocation method nor its application is at issue in this case.

Other facts are discussed where pertinent in the body of the opinion.

## I

█ Initially, United claims the Department erred in using, and the Tax Court erred in allowing, accounting approaches to valuation of United's property that differ from those accepted by this court in previous *ad valorem* tax cases involving public utilities. United argues,

> "[t]his Court once again faces a number of methodological issues it already has addressed and decided in previous utility property tax appeals. United's appraisal complied with the precedents established by this Court; the Department and the Tax Court both refused to accord any weight to those precedents, notwithstanding that United urged that the Tax Court follow those precedents. * * * Indeed, the Tax Court nowhere even discussed the question of *stare decisis.*

> "* * * * *

> "In this case the Department and the Tax Court erroneously disregarded two very important prior decisions of this court. The first is *Burlington Northern v. Dept of Rev,* 291 Or 729, 635 P2d 347 (1981)[; the second is] * * * *Pacific Power & Light Co v. Dept of Rev,* 286 Or 529, 596 P2d 912 (1979) * * *."

It is true, as United argues, that both cases are utility property tax cases that discuss the methodology of valuing such property, but when this court evaluates and then either accepts or rejects various theories of valuation offered by the parties, it almost always does so as a finder of fact on *de novo* review of the record made in the Tax Court. *See Bend Millwork v. Dept. of Revenue,* 285 Or 577, 581-82, 592 P2d 986 (1979); *see also Publishers Paper Co. v. Dept. of Rev.,* 270 Or 737, 756-57, 530 P2d 88 (1974). Such decisions on the facts have *no precedential value,* a point best made by noting that this court accepted and relied upon an expert's testimony in one of these cases, but rejected the very same testimony by the very same expert in the other case. This is because other testimony in each case may either bolster or undermine the

expert testimony in question, and this court decides each case on its own record.[2]

We reject United's effort to impeach the argument of the Department or the decision of the Tax Court by attempting to make legal precedent out of this court's previous factual decisions in cases involving *ad valorem* taxation of public utilities. We turn now to United's factual arguments arising out of the testimony in the present case.

## II

As required by OAR 150-308.205-A(2), evidence was offered by United and the Department concerning all three traditional approaches to valuation of public utility properties: the market (or comparable sales) approach, the income (capitalized income) approach and the cost approach. Each approach in turn may be carried out by one or more techniques, depending on available information. Each valuation approach used (and each technique for utilizing that approach) has its own methodology, its own virtues and its own shortcomings.

In the material that follows, we set out our understanding of the approaches and techniques utilized by each side, together with each side's objections to the other's approach. We next determine which of the parties' approaches and techniques we accept, based on our independent review of the evidence. Finally, we determine the appropriate valuation of United's property.

___

[2] We recognize that United is dissatisfied with such an approach, but on the present state of the law we deem it the only one we can perform consistent with our statutory review function. We have previously pointed out that we could confine our review to legal questions if the Department would promulgate rules relating to valuation methods, but the Department has not chosen to enact such rules. *See Southern Oregon Broadcasting Co. v. Dept. of Revenue,* 287 Or 35, 41-42, 597 P2d 795 (1979). If this or any other taxpayer would prefer to see this court function in this kind of case only as a law-deciding court—and we would wholeheartedly endorse such a suggestion—it needs to apply to the legislature for appropriate changes in the law. Direct, *de novo* review of often extremely complicated factual issues by a court consisting usually of seven relative amateurs in the taxation field, after those issues already have been decided by a judge especially selected for his or her expertise in this area of the law, should be eliminated. Until such time as the law is changed or the Department can be persuaded to put its methodology in the form or rules, taxpayers must be prepared to live with this court's understanding of its assignment as factfinder.

## 1. The Market (Comparable Sales) Approach to Valuation

The parties do not dispute the values under this approach. The parties agree that, strictly speaking, it is not possible to value United by using comparable sales, because large integrated public utilities like United rarely are sold. However, United's expert appraiser, Dr. John H. Davis III, offered a substitute technique, the "stock and debt approach."[3] We need not set out in detail Davis's reasoning or his calculations under this theory. The Tax Court accepted them, as do we, and the Department in this court does not dispute Davis's results. Those results were:

|  | 1983[4] | 1984 |
|---|---|---|
| Stock and debt valuation | $94,594,000 | $98,692,000 |

We next examine the evidence relating to the income (capitalized income) approach.

## 2. The Income (Capitalized Income) Approach to Valuation

Under the income approach, the value of the company is derived by use of the accounting formula, $V = I/R$. The "I" in the formula is income. It is derived from an estimated income figure for the company. The resulting figure ("I") is then divided by a capitalization rate ("R")[5] to obtain a value ("V"). At issue in this part of the case are the techniques used by the parties to find appropriate values for "I" and "R."

### a. Income ("I")

■ The figure sought in this part of the valuation process is the numerator in the formula, $V = I/R$. It represents a predicted income level for United in the year ahead, based upon historical data. The testimony shows that there are a number of different techniques for deriving the income figure,

---

[3] Use of the "stock and debt" approach is anticipated and authorized by OAR 150-308.205(2)(d).

[4] With one exception, the figures as to the contested issues in this case relate to 1983. The parties agreed in the Tax Court that the methodology for the two years should be the same, so resolution of issues concerning the earlier year could be applied to the later year as well, subject to historical adjustments to asset and income figures necessitated by the passage of time. *See United Telephone Co. v. Dept. of Rev.,* 10 OTR 333, 334 n 2 (1986). We shall follow the same approach in this opinion.

[5] The capitalization rate also is referred to variously in the evidence and exhibits as the "equity rate" and the "discount rate." We use "capitalization rate" throughout.

but the expert appraisers for the parties—Davis for United and Roger Maude for the Department—finally settled on the same technique and obtained figures that were relatively close.

Davis relied on a performance-ratio analysis, which he described as the "best technique." The technique divided the net operating income (NOI) derived from a calendar year by the net operating plant at the start of the same year.[6] This produced a figure representing the percentage of the value of a plant at the beginning of the year that an investor might hope to earn by the end of the year. By Davis's calculations, the performance ratio derived from the actual experience of United for the five previous years was 10.65 percent, yielding a projected income ("I") for 1983 of $14,679,158. Rounding off this amount, Davis opined that a reasonable estimate of United's next year's income would be $15,000,000.

Roger Maude, one of the Department's experts, also used a performance-ratio analysis much like that done by Davis, although he apparently used a figure representing "average plant for the year," rather than net operating plant at the beginning of the year, as his denominator. No explanation for this difference in approaches was offered. Because the average plant was invariably larger than beginning of the year plant, Maude's resulting performance ratios were correspondingly smaller and, therefore, his estimated future income was slightly smaller, *vix.,* $14,431,500, which he rounded up to $14,432,000 for purposes of further calculations.

While there was no major difference between the parties as to the revenues to be capitalized, the choice of figures had some impact on the ultimate calculation of value under this approach. The Tax Court's ultimate calculations accepted Maude's figure of $14,432,000.

We accept Davis's figure as more persuasive, because the fixed point in time on which the Davis technique depends corresponds to a moment that is significant for regulatory purposes. Rounding off the figure to the nearest thousand, we

[6] Both the "net operating income" and "net operating plant" figures are taken directly from reports United files periodically with the Federal Communications Commission and the Oregon Public Utility Commission. It files similar reports with the Department. ORS 308.520; 308.525.

find the appropriate income figure to be $14,679,000. This will have the net effect of slightly increasing the appellant, United's, tax liability for 1983, but that is one of the risks inherent in *de novo* review.

### b. Capitalization Rate ("R")

■ The capitalization rate measures the present value of projected future benefits that a potential investor might reasonably expect from ownership of the property being evaluated. Establishing an appropriate capitalization rate is one of the principal battlegrounds in this litigation. This is not surprising, in view of the fact that a small adjustment in that decimal figure may (and in this case will) have a major impact on the ultimate figure computed for value. We turn to an examination of the way each party's expert approached this computation.

Davis used one technique to derive a capitalization rate; Maude used three. Davis's technique and two of Maude's were "perpetuity" models, *i.e.,* they assumed that recovered depreciation on company property would be reinvested continuously, assuring an income stream in perpetuity.[7]

Evidence from both experts shows that different kinds of investment in the same company earn different rates of return. For example, the return an investor might receive on a long-term debt of a company would probably differ from the return the investor would receive through ownership of preferred stock, or of common stock. These three forms of investment are called "bands" of investment by both experts. Because of these different rates of return, Davis and Maude agreed that it is appropriate to establish different capitalization rates for these "bands" of investment, then weight each of the three bands according to the percentage of participation

---

[7] Maude's third technique was a "remaining life" model, named for the fact that it makes no assumption about reinvesting recovered depreciation but instead treats the existing assets as if they are the only ones and depreciates them until there is only a salvage value remaining. United objects most strenuously to consideration of the "remaining life" model, contending that this court refused as a matter of law to consider such a model in *Burlington Northern v. Dept. of Revenue,* 291 Or 729, 635 P2d 347 (1981). We have already indicated that United misreads what we did in *Burlington Northern.* In any event, we shall ignore the evidence concerning the remaining life model, because the Tax Court appears to have ignored this theory and the Department itself chooses not to rely on it in this court.

of each in the overall capital structure of the company, and take an average. After agreeing on this principle, however, the experts part company.

Davis began by making certain assumptions with respect to this technique. As noted, he assumed constant reinvestment of depreciation to maintain plant and to produce income. He also assumed that the resulting income stream would be flat, *i.e.,* the same from year to year. He based this last assumption on the belief that, so long as it did business in a heavily regulated industry in which the maximum return was set by law, United could at best maintain its current income level.

In seeking to establish a capitalization rate using the band-of-investment technique, Davis first looked for comparable companies in order to obtain the widest possible statistical sample for his band-of-investment calculation. He found none. He therefore concluded that the only way to make a band-of-investment calculation was to utilize United's own capital structure.[8] That structure was as follows:

| Capital Structure | '83 Percentage | '84 Percentage |
|---|---|---|
| Long-term Debt | 43.66% | 44.15% |
| Preferred Stock | 00.54% | 00.56% |
| Common Stock | 55.80% | 55.29% |
| | 100.00% | 100.00% |

Having selected what he believed to be reliable figures for the band-of-investment technique, Davis then determined the cost of capital of each of these three bands. For the debt and preferred stock bands, he simply obtained a standard investment service's rating for each kind of investment in United for each year (it was "A," on a scale running from "AAA"—the most secure—to "CCC"—the most risky) and then employed the investment service's figures for yields to maturity on the assessment date for "A"-rated public utility investments of that kind. These values were:

| Type of Capital | '83 Yields | '84 Yields |
|---|---|---|
| Debt | 14.40 | 13.5 |
| Preferred Stock | 12.20 | 12.61 |

Davis justified this approach by noting that all similarly rated

---

[8] Davis did note, however, that the capital structure for the industry as a whole was similar to United's capital structure.

companies in the same industry grouping ("A"-rated public utilities, in this case) face basically the same risks.

Davis encountered his greatest difficulty determining a figure for the value of the common stock. He chose to rely on what he called the "risk premium" technique.

Under the "risk premium" technique, a "risk free" rate of return on investment is first determined. This rate is usually the current Treasury bill ("T-bill") rate, because such a security is regarded as absolutely safe. The T-bill rate for 1983 was 7.98 percent; for 1984, it was 8.6 percent.

Davis testified that once the risk-free rate is established, it is theoretically necessary to add a premium that reflects the relative risk of the endeavor for which the equity in question—in this case, a theoretical common stock of United—is being issued. Davis derived this risk premium from a study called "Ibbotson-Sinquefield" after its developers. The study traces the history of a large number of stocks over roughly the last 60 years and assigns risk premiums that should be associated with various classes of those securities. Davis determined that the appropriate risk premium attributable to stock like that of United was 8.3 percent. This premium added to the T-bill ("risk free") rate gave a total of 16.28 percent as the indicated capitalization rate ("R") for the year 1983.[9] The rate for 1984 would be 16.90 (8.3% + 8.6%).

With the market rate of return for common stock thus calculated, Davis multiplied each capitalization rate by its percentage of the band of investment, producing the following results:

1983

| CAPITAL STRUCTURE | PERCENT OF CAPITAL STRUCTURE | × | COST OF CAPITAL | = | WEIGHTED COST OF CAPITAL |
|---|---|---|---|---|---|
| Long-Term Debt | 43.66% | × | 14.40% | = | 6.29% |
| Preferred Stock | .54% | × | 12.20% | = | .07% |
| Common Stock | 55.80% | × | 16.30% | = | 9.10% |
| Total | 100.00% | | | | 15.46% |

Davis rounded off the final figure to 15.45, which he declared

---

[9] Davis actually calculated three different indicated equity rates, using three different hypothetical situations. He chose the lowest result of the three calculations—16.28. The other calculations are not relied upon by anyone, and we do not consider them.

to be his capitalization rate. The final calculation was then simply a matter of dividing $15,000,000 ("I") by .1545 ("R"). The resulting value was $97,087,379, which Davis rounded off to $97,087,000. His figure for 1984, derived by the same process, was $98,726,000.

Maude also used a band-of-investment technique. Unlike Davis, however, he chose three other telecommunications companies he felt were sufficiently analogous to United and took an average of their capital structures as the foundation for his computations. The companies were:

| COMPANY NAME | CAPITAL STRUCTURE AT MARKET VALUE | | |
|---|---|---|---|
| | COMMON | PREFERRED | DEBT |
| Commonwealth Tel | $39,277,000 | $1,439,000 | $60,092,000 |
| Lincoln Telecom | 86,365,000 | 4,827,000 | 46,299,000 |
| Rochester Tel | 272,644,000 | 8,138,000 | 80,696,000 |
| TOTALS | 398,286,000 | 14,404,000 | 187,087,000 |
| GRAND TOTAL | | | 599,777,000 |
| CAPITAL STRUCTURE | 66.4 | 2.4 | 31.2 |

Having derived what he deemed to be a typical capital structure by this averaging approach, Maude then turned to market information, as had Davis. Again, like Davis, he readily arrived at expected return figures for the first two types of equities, *viz.,* long term debt and preferred stock. His figures were:

Long term debt  12.82%
Preferred stock  13.90%

To establish the expected return on common stock, however, he was forced (as was Davis) to consider several different techniques.

Maude listed four techniques for estimating a return on common equity: the discounted-cash-flow (DCF) technique, the earnings-to-price ratio (E/P, also commonly reversed as "P/E") technique, the earnings-to-book ratio (E/B) technique, and the risk-premium technique.[10] While Davis had professed to be unable to use any of the first three, Maude used them all. He derived the following expected rates of return on common stock:

---

[10] Maude's list includes all the methods considered by Davis except one called the "CAPM" technique, a technique Davis disregarded in any event.

| DCF approach | 17.9% |
|---|---|
| E/P ratio | 14.4% |
| E/B ratio | 13.0% |
| Risk premium | 16.2% |

The average of the four approaches was 15.375. Maude, however, considered the DCF approach and the risk premium approach more reliable and therefore used the average of those two—17.1—as his multiplier.

Maude's final calculations produced the following result:

1983

| CAPITAL STRUCTURE | | RATE OF RETURN | WEIGHTED PERCENT |
|---|---|---|---|
| Long-Term Debt | 31.2% | 12.8% | 3.99% |
| Preferred Stock | 2.4% | 13.9% | 0.33% |
| Common Stock | 66.4% | 17.1% | 11.35% |
| TOTAL | | | 15.67% |

Maude's discount rate—his "R"—under the band-of-investment technique was thus 15.67.

Maude also utilized one further technique, a "perpetuity" model. As Maude explained it, the perpetuity model assumes that the annual capital recovery (depreciation) by a company will be reinvested in capital assets continuously into the future in a manner consistent with historic practices of the company. Davis's model, which made the same assumption, is a perpetuity model. A second assumption of the model is that income from the property will continue indefinitely into the future.

Davis postulated that this continued income would be at a flat rate, *i.e.,* income from year to year would not vary. Maude specifically rejected this assumption because historical experience would not validate it—United's income had continued to rise over the years—and because he believed that external forces such as inflation would also dictate that income would increase rather than remain static. Therefore, any calculation under the formula $V = I/R$ would seriously undervalue the company unless it included some allowance for growth.

This growth factor is illustrated by the way Maude

made his calculations. His original income figure ("I") was $14,432,000. His original capitalization rate ("R") was .1567. Carrying out the calculation produces a "V" of $92,099,553, rounded up to $92,100,000.

But, as noted, Maude objected that this figure was too low because it made no allowance for growth. The problem, he explained, was that the "I" figure was a historical, no-growth figure while the "R," derived as it was from market information, had the market's own expectation of growth as a built-in factor. Dividing a no-growth "I" by a growth-influenced "R" would, in Maude's opinion, seriously understate the value of the company. Whether the assumption was "growth" or "no growth," he testified, the numerator and denominator in the fraction I/R needed to be derived on the same assumption. Maude therefore sought a figure for "R" that would be approximately no-growth. As a surrogate for this figure, he adopted the rate of return United actually was allowed by the Public Utility Commission to earn at the time—12.3. This led to the following calculation:

$$V = \frac{14{,}432{,}000}{.123} = 117{,}333{,}000$$

This calculation did not depend for its validity on Maude's utilization of the three outside telephone companies to generate a capital structure model.

Maude then made a second computation in which, instead of taking growth out of "R," he attempted to factor growth into "I." For this computation, Maude assumed a modest growth in income of 2.5 per year. The computation was:

$$V = \frac{14{,}432{,}000 + 2.5\% \text{ per year}}{.1567} = \$108{,}551{,}000$$

Maude criticized the resulting figure as probably being too low, because growth would probably come much closer to 3.0 per year.

In summary, Maude's two perpetuity model valuation figures were $117,333,000 (a figure generated by taking growth out of both numerator and denominator in the equation V = I/R) and $108,551,000 (a figure generated by attempting to put growth into both parts of the fraction).

The Tax Court rejected Maude's attempt to postulate

an average capital structure by the use of the three outside telephone companies. Only one of the three, the court noted, closely resembled United's own capital structure. The court concluded that "[w]ith this range in such a small sample, any average would be meaningless. [United's] actual capital structure is far more relevant and meaningful." *United Telephone Co. v. Dept. of Rev., supra,* 10 OTR at 339.

The court next reviewed the capitalization rates ("R"s) proposed by both sides. It purported to accept Davis's rate, probably because Maude's rate was derived from assumptions about the three outside telephone companies. However, the Tax Court ultimately seems to have abandoned Davis's capitalization rate as well.

Concerning the other half of the fraction (the income figure, "I"), the court noted that the two sides were not far apart, but did not identify specifically which calculation (if either) it accepted. The court then turned to the pivotal issue of "growth."

As noted, the Davis approach assumed no growth in income. Both of Maude's techniques assumed growth. Although the Tax Court considered some of Maude's specific figures (by implication, those used in generating a value using enhanced income) flawed because of Maude's original hypothesis that a capital structure could be postulated based on the average of the structures of the three outside telephone companies, the court nonetheless found his argument for some element of growth persuasive. It did not further explain its choice of growth models. Instead, it simply announced the result of its calculation—a valuation of $117,500,000 based on the income approach.

This valuation is almost precisely that determined by Maude based on his modified, "no growth" perpetuity model. We conclude that the Tax Court accepted Maude's theory that United's permitted rate of return was a rational surrogate for "R." Thus, the Tax Court apparently calculated the income valuation as follows:

$$V = \frac{14{,}432{,}000}{.123} = 117{,}333{,}000 \text{ SAY } 117{,}500{,}000$$

We agree with this analysis. With the smoke cleared away, the only technique that persuades us as the triers of fact

is Maude's simple "no growth" formulation. All the techniques that attempted, either explicitly or implicitly, to include growth as a factor make assumptions we do not find persuasive. Thus, we conclude that the appropriate capitalization rate ("R") to be used in a "no growth" formulation is 12.3.[11] For the reasons already stated, however, we are more persuaded by Davis's income figure ("I") than by that offered by Maude. Thus, we select $14,679,000 as the appropriate income figure. This produces the following calculation of value by the income method:

$$V = \frac{14,679,000}{.123} = 119,341,000$$

We find that the value for United for 1983 calculated by the income method is $119,341,000.

### 3.   The Cost Approach to Valuation

■        The experts agree that historical cost less depreciation (HCLD) properly establishes the cost indicator of value for a closely regulated utility like United. HCLD is an item periodically reported by United to both the state Public Utility Commission and the Federal Communications Commission, and is the basis upon which United is allowed to earn a return. Both Davis and Maude used HCLD. Davis, however, made an adjustment for "obsolescence" that substantially reduced the value he reported under this indicator.

Davis began with a figure for United's net telephone plant plus material and supplies (also called "net operating plant in service"), $139,704,371, which both parties accepted. From this figure, however, he subtracted the amount of $42,616,990, which he described as an appropriate deduction from net plant for "obsolescence." This left a net of $97,087,381 which, rounded off, exactly equalled Davis's final figure under the income indicator, *vix.,* $97,087,000.

---

[11] This is not to suggest that we are persuaded by United's claims that it is unreasonable to expect it to grow in the near term due to the unsettling effects of telecommunications industry deregulation. While one might conclude intuitively that there eventually will be some income fluctuations as a result of this ongoing process, no one's prognostications on this record rise much above what one might divine from the entrails of an owl. This is not a criticism of the experts—it is simply clear from their own testimony that it is much too soon to tell what the ramifications of deregulation will be for United.

Davis rationalized the deduction by explaining that when actual earnings of a company are less than its authorized rate of return, the difference between the two, when capitalized, will reflect obsolescence in the property. His calculation for this was interesting:

(1) HCLD × discount rate (R) = required earnings

(2) $139,704,371 × .1545 = $21,584,325

(3) Projected earnings for the period are $15,000,000.

(4) The shortfall between required earnings at the discount rate and the projected earnings ($21,584,325 − $15,000,000 = $6,584,325) is a reflection of obsolescence, *i.e.,* an inability to earn full return on the rate base.

(5) Capitalizing the shortfall at 15.45, the present value of the shortfall is $42,616,990.

Therefore, Davis reasoned, the accurate figure for the value of United is $139,704,000 − $42,617,000, or $97,087,000, when rounded off to the nearest thousand.

Maude's approach, on the other hand, was simplicity itself: He reported net operating plant in service, $139,704,000, as the cost indicator. He rejected the idea that obsolescence played a role in calculating the cost indicator.

The Tax Court rejected Davis's theory of obsolescence on two bases:

"First, * * * the mathematical logic of Dr. Davis' approach essentially converts the cost approach to an income approach. Where the income and the rate are given, Dr. Davis' method will always result in a value exactly the same as the income approach because it shoves the cost out the back door. Algebraically, the method cancels all cost in excess of the value indicated by the income approach as obsolescence.

"* * * * *

"* * * In theory, each approach [to valuation] views the concept of value from a different perspective, with the intent of considering all facts and perspectives relevant in the result in the marketplace. Adjusting one approach to make it rely on the result in the same indication of value as another approach

effectively eliminates a relevant perspective from consideration.

'Where data for use of the three approaches to value are available, the overwhelming weight of authority on the part of writers and qualified experts is that each of the three approaches to value should be utilized.' *Pacific Power & Light Co. v. Dept. of Rev.,* 7 OTR 203, 217 (1977).

"The second error of Dr. Davis is his assumption that failure to earn a market rate of interest on HCLD is an indication of obsolescence. The fact that other investments may produce a greater return is no indication of obsolescence. The evidence in this case established that regulated utilities are viewed as bearing less risk than other companies and therefore can obtain investor capital at less cost. Hence, it is to be expected that their earnings would be less than companies which bear a greater risk. If there is obsolescence in [United's] property, it can only be disclosed in this context by comparing companies."

10 OTR at 337-38.

Having rejected Davis' theory for reduction of HCLD, the Tax Court adopted Maude's figure of $139,704,400.

We agree entirely with the explanation and rationale of the Tax Court. It may be that there is obsolescence in United's plant and that a cogent theory could be developed for identifying that obsolescence and subtracting it from HCLD.[12] But Davis's argument, based on circumstances not comparable to those presented in this case, is not that theory.

We find that the cost indicator for valuation of United for *ad valorem* tax purposes in 1983 was $139,704,000.

## 4. Disposition

Based on the foregoing factual determinations and analysis, we find that the 1983 indicators of value are as follows:

---

[12] *Cf. also* this court's discussion of "obsolescence" in *Reynolds Metals Co. v. Dept. of Rev.,* 299 Or 592, 603-06, 705 P2d 712 (1985).

| Stock and debt | $ 94,594,000 × 20%[13] | $18,918,800 |
|---|---|---|
| Cost | $139,704,000 × 40% | $55,882,000 |
| Income | $119,341,000 × 40% | $47,736,000 |
| Total | | $122,536,000 |

From the foregoing calculations, we determine that the true cash value of United's system as of January 1, 1983, was $122,536,000. The judgment of the Tax Court is modified accordingly.

Determination of the true cash value of United's system as of January 1, 1984, requires that we address the cross-appeal.

### III

The Tax Court announced its determination of the indicators of value for 1984 as follows:

"[W]ith regard to the 1984 year, the court finds that the indicators of value are as follows:

| Stock and debt | $98,692,000 × 20% | $19,738,400 |
|---|---|---|
| Cost | 137,395,500 × 40% | 54,958,200 |
| Income[fn] | 125,000,000 × 40% | 50,000,000 |
| | | $124,696,600 |

"Based upon these indications of value, the court finds that the value of plaintiff's system as of January 1, 1984, was $125,000,000.

"[fn]The court has determined that a lesser projected income should be used than that utilized by Mr. Maude in recognition of the unusual income received by [United] from the AT&T breakup."

10 OTR at 342.

The Department assigns error to the reduction in the income indicator of value. It maintains that there is no basis in this record for the Tax Court's conclusion that Maude's income figure included any income attributable to the breakup of the American Telephone & Telegraph Corporation.

United admits that, if the court's footnote is to be

---

[13] The percentage weighting to be attributed to each indicator of value is not at issue.

read as the Department reads it, there is no evidence to support the Tax Court's reduction in Maude's income figure. United's theory, however, is that the Department misreads the footnote. Noting that the record does contain evidence to the effect that United could anticipate *losing* income due to the decrease in subsidies that the company had been receiving from AT&T, United argues:

> "To make the footnote fit the record and to carry out the Tax Court's obvious intent, the word 'from' in the [footnote] should be replaced with 'prior to.'"

United then makes an argument based on the premise that the Tax Court footnote should be read as United reads it.

In view of this court's *de novo* review authority, it may be that we should simply ignore this entire argument and decide the income indicator value for ourselves. On the other hand, the Department premised its entire assignment of error on the idea that the footnote is legally incorrect; the Department does not ask us to reconsider the figure the Tax Court used if the underlying factual assumption is correct. An alleged legal error being the basis of this assignment of error, we shall first determine if a legal error has been committed.

As already noted, an error has been committed if the Tax Court meant what the Department says it meant. United argues that the footnote should instead be read as follows:

> "The court has determined that a lesser projected income should be used than that utilized by Mr. Maude in recognition of the unusual income received by [United] prior to the AT&T breakup."

The difficulty with this proposal is that it does not serve United's theory. United asks us to assume that the Tax Court thought that the subsidies that United had received from AT&T were "unusual." They were not. They were an integral part of United's income for years. (They were, for example, a part of United's expected income for 1983, yet no special treatment or deduction arising out of the payments had been proposed for 1983.) We are not persuaded by United's alternative reading of the footnote.

Neither can we think of another way to read the footnote than that argued by the Department. We conclude that the reduction the Tax Court made in the 1984 income

indicator of value was erroneous. This brings us to the question of what the appropriate income figure should be.

The two appraisers approached their income indicator calculations in precisely the same way they had done their 1983 calculations; the record contains nothing that would support some other approach. We therefore feel constrained to decide the problem the same way.

We accept Maude's approach that substitutes United's permitted rate of return for "R." In this particular technique, the values reported by Maude are "I" = $14,673,800; "R" = .123. From these values he purports in his appraisal to calculate a value indicator for 1984 of $117,329,300. This figure is precisely the same amount he had calculated for 1983. We suspect that an error has been made. Our own calculation is as follows:

$$V = \frac{14,673,800}{.123} = 119,299,000$$

We find that the correct income indicator of value for the year 1984 is $119,301,000. This reduces the total value of United (and, therefore, United's tax) from that which would have existed had there been no cross-appeal but, again, that is one of the possible consequences of a *de novo* review.

The 1984 calculation of value for the United system is as follows:

| Stock and Debt | $98,692,000 × 20% | $19,738,400 |
|---|---|---|
| Cost | 137,395,500 × 40% | 54,958,200 |
| Income | 119,299,000 × 40% | 47,719,600 |
| Total | | $122,416,200 |

Rounded to the nearest $1,000, we find that the value of United's system as of January 1, 1984, was $122,416,000. The judgment of the Tax Court is modified accordingly.

The judgment of the Tax Court is modified. The case is remanded to the Tax Court for further proceedings consistent with this opinion.